## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | | |
|---|---|---|
| **RAYMOND D. STANFILL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:10-CV-255(MTT)** |
| | ) | |
| **CULLEN TALTON, _et al.,_** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>ORDER</u>

This case concerns the treatment of Robert Lewis Stanfill ("Stanfill") by various officers and medical personnel at the Houston County Detention Center ("HCDC") on July 2 and 3, 2008.  Stanfill died while in HCDC custody on July 3, 2008.  Plaintiff Raymond Stanfill, Robert Stanfill's father, brings this action individually and as the administrator of his son's estate, alleging that the Defendants violated his son's rights under the Eighth and Fourteenth Amendments.  He also brings medical malpractice claims under Georgia law against Defendant Southern Health Partners ("SHP").[1]

This matter is before the Court on the Motion for Partial Summary Judgment of Plaintiff Raymond Stanfill (Doc. 85) and the Motion for Summary Judgment of Defendants Sheriff Cullen Talton, Major Charles Holt, Sergeant James Wheat, Lieutenant David Carrick, Corporal Donald Lester, Officer Eddie Serrano, Corporal Carol Oates, Deputy James Collins, and Lieutenant Michael Garrett (collectively referred to as the "Houston County Defendants") (Doc. 89).  Also before the Court is the

---

[1] Defendant AEDEC International, Inc., the manufacturer of the restraint chair involved in this action, has been dismissed with prejudice.  (Doc. 81).

Plaintiff's Motion for Sanctions.  (Doc. 54).  For the reasons set forth below, the Plaintiff's Motion for Sanctions is denied, the Plaintiff's Motion for Partial Summary Judgment is denied, and the Defendants' Motion for Summary Judgment is granted.

## I.  Factual Background

The relevant facts are taken from the Plaintiff's Complaint (Doc. 1) and the parties' Statements of Material Facts and responses thereto (Docs. 126 &127). Pursuant to Federal Rule of Civil Procedure 56(e) and Local Rule 56, all material facts not specifically controverted by specific citation to the record are deemed admitted, unless otherwise inappropriate.

### A.    Parties/HCDC Chain of Command

Defendant Cullen Talton has served as the Sheriff of Houston County since 1973.  As Sheriff, Talton sits at the top of the Houston County Sheriff's Office chain of command.  Although Talton retains ultimate authority over the activities of the Sheriff's Office, he delegates authority over HCDC to Major Charles Holt and the officers beneath Major Holt.  (Doc. 127 ¶¶ 275-278).  Holt has served as the primary administrator of the Houston County Detention Center since 2000.  In that capacity, he is responsible for the overall supervision and operation of HCDC.  Holt's duties include promulgating HCDC policies and procedures.  During the events in question, neither Talton nor Holt was present at HCDC, and neither interacted with Stanfill in the 24 hours preceding his death.

In July 2008, Lieutenants David Carrick and Michael Garrett were shift supervisors at HCDC.  During their shifts, Carrick and Garrett had responsibility for the overall operation of HCDC.  Their duties included, but were not limited to, receiving and

releasing inmates, surveillance of inmates, and supervision of other officers as they interacted with inmates.  Sergeant James Wheat was also a shift supervisor and had been working as a jail officer for approximately 12 years.  At the time of the incident, Wheat was assigned to inmate housing, where he supervised the deputies and made sure the housing units were properly operated.  Corporal Donald Lester, Officer Eddie Serrano, and Corporal Carol Oates were all detention officers with various responsibilities.  Deputy James Collins was a booking clerk rather than a detention officer, and therefore had no law enforcement responsibilities and very limited interaction with inmates.  Collins' duties were limited to entering data into the computer.

Defendant Southern Health Partners, Inc., is the independent contractor retained to provide medical staff and treatment to inmates at HCDC.  SHP provides HCDC with licensed, qualified medical personnel and 24-hour access to basic medical care for inmates.  Ordinarily, inmates would provide SHP medical staff with prescription drug information during the booking process, and it would then be SHP's responsibility to administer any medication.  SHP has a mental health nurse on staff, and they also coordinate mental health care with outside mental health providers.  Mental health services are only provided during the day shift, and, accordingly, mental health staff is unavailable at night.  HCDC officers are not tasked with supervision of medical personnel, and, with very limited exceptions, are required to comply with all medical directives of SHP staff regarding inmate medical care.

### B.    The Incident

On June 30, 2008, Stanfill was arrested for burglary pursuant to a valid warrant and booked into HCDC.  (Doc. 127 ¶ 45).  Stanfill had been incarcerated at HCDC on

numerous prior occasions.  (Doc. 127 ¶ 7).  In addition to his criminal history, Stanfill also had a history and reputation at HCDC of cutting his wrists and threatening suicide and other self-harm.  (Doc. 127 ¶ 8).  Despite HCDC precautions, Stanfill was adept at obtaining materials that could be used to cut himself or reopen old wounds, such as buttons from his prison jumpsuit, pieces of broken light bulbs, and even his toenails. (Doc. 127 ¶¶ 11-12, 30).  Stanfill was also known to associate with other "cutter" inmates in order to obtain cutting materials and to offer and receive "encouragement" for his and their self-destructive acts.  (Doc. 127 ¶¶ 13-16).

Stanfill treated HCDC staff with similar disregard.  His "ordinary routine" was to verbally abuse HCDC officers and medical personnel using profane language and threats of physical harm to both himself and others.  (Doc. 127 ¶ 33).  When Stanfill had to be restrained, he would spit on officers and become agitated, and on at least one occasion, he attempted to throw blood on an officer.  (Doc. 127 ¶¶ 34-36).  Other times, Stanfill would refuse to take his medication, and during one previous incarceration, he falsely claimed he could not breathe.  (Doc. 127 ¶¶ 37-39).

Because of his behavior, Stanfill was often placed on suicide watch pursuant to HCDC policy requiring special precautions, such as preventative clothing and restraints, for inmates with suicidal tendencies.  (Doc. 127 ¶¶ 17-18).  On one previous occasion, Stanfill was restricted to a restraint bed for approximately 36 hours, with periodic releases.  (Doc. 127 ¶ 20).  In addition to his ability to find ways to injure himself, Stanfill was also adept at escaping from, or at least lessening the effect of, various restraints and other protective devices used by HCDC.  (Doc. 127 ¶¶ 23-27).  Based on his prior

incarcerations, most, but not all, HCDC officers and SHP medical personnel were familiar with Stanfill's tendencies.  (Doc. 127 ¶ 52).

During the course of his booking on June 30, 2008, Stanfill was sent to speak with the medical staff, but he refused to speak with Nurse Lily Green or the mental health nurse.  (Doc. 127 ¶¶ 46, 51).  It is undisputed that neither Stanfill nor any member of his family provided HCDC with any needed medication, nor is there any evidence that Stanfill was prescribed any medication at or immediately preceding the time of his June/July 2008 incarceration.  (Doc. 127 ¶¶ 47-48, 50).[2]  Due to Stanfill's history of self-harm, at the time of his booking he was labeled a suicide risk and was placed on suicide watch, which required officers to visually check Stanfill every 15 minutes.  (*Id.* ¶¶ 54-55).  These precautions lasted through the afternoon of July 2, 2008.  (Doc. 127 ¶ 56).

On the afternoon of July 2, Stanfill was being housed in cell J-1, which the Court notes for purposes that will become apparent, had a sink from which Stanfill could drink freely.  (Doc. 127 ¶ 57).  At approximately 5:45 p.m., Sergeant James Wheat discovered that Stanfill had placed a tourniquet around his arm and, with pieces of a metal button from his prison jumpsuit, cut his arm.  (Doc. 127 ¶ 59).  For whatever reason, Stanfill used the tourniquet to build up the blood and then released it, causing blood to spread across the cell.  (Doc. 127 ¶ 61).  Medical staff was immediately alerted, and Stanfill was taken to the medical area where his arm was bandaged and nurses assessed his condition.  (Doc. 127 ¶ 84).  While in medical, Wheat discovered that Stanfill had additional pieces of the metal button hidden in his mouth with which he presumably

_____

[2] There is evidence that during a prior incarceration in January/February 2008, Stanfill was taking Wellbutrin and Seroquel, both medicines used to treat depression and other mental disorders.  (Kaplan Dep. at 123).

intended to cut himself again.  (Doc. 127 ¶ 85).  Wheat was familiar with Stanfill from his prior incarcerations, and was aware of one previous occasion in which Stanfill obtained glass from another inmate and used the glass to cut his own arm.  (Doc. 127 ¶ 79). While Stanfill was washing the blood from his body in the shower, he allegedly told Wheat that if given the opportunity, he would kill himself.  (Doc. 127 ¶ 90).  Despite already being on suicide watch, Wheat concluded from this statement that Stanfill was a serious suicide threat.  However, because Wheat felt he was already taking the necessary precautions to make sure Stanfill would not hurt himself further, Wheat did not report the suicide threat to his superiors.  (Doc. 127 ¶ 90).  After his shower, Stanfill was placed in a suicide smock, which is a "one-piece quilted material with Velcro adjustments on the shoulders."[3]  (Carrick Dep. at 93).

Lieutenant David Carrick was the night-shift supervisor on July 2 and 3, and in that capacity had overall responsibility of HCDC from 6:00 p.m. on July 2 until 6:00 a.m. on July 3.  Due to Stanfill's suicide threats and because he was known to reopen his old wounds, Carrick ordered Wheat to place Stanfill in a restraint chair.  (Doc. 127 ¶ 94). This order was made sometime between 6:00 and 6:30 p.m. on the night of July 2. When Stanfill was placed in the chair, he was in the medical area and in the presence of a nurse, who apparently had no objections.  (Carrick Dep. at 62).  The chair Stanfill was placed in was a "Prostraint Chair" manufactured by AEDEC International, Inc.  (Doc. 127 ¶ 232).  Although the record is unclear, Stanfill was secured to the chair using several built-in straps: one strap crosses diagonally from above each shoulder across the chest (forming an "X") and buckles in near the waist, similar to a seat belt, and a

---

[3] A suicide smock is made out of a heavy material that pretrial detainees cannot tear, ingest, or use to choke themselves.  As can be seen in the video, the smock does not pin Stanfill's arms to his side nor does it restrict leg movement in any way.

third strap crosses over the lap.  In addition, Stanfill's wrists and ankles were placed in Velcro straps and handcuffs and leg irons were applied for added security.[4]  (Wheat Dep. 29-30).  Another strap was placed around Stanfill's shins.  (Wheat Dep. at 109-10).  As a matter of practice, Wheat would always check to make sure the straps and cuffs were not too tight, although he does not specifically remember doing so with Stanfill.  (Wheat Dep. at 69).

At the time in question, HCDC had no formal written policy governing when restraint devices were to be used or how long an inmate should be restrained.  (Doc. 127 ¶ 243).  Instead, use of restraints was governed by informal "guidelines," under which officers were afforded discretion in deciding when and under what conditions restraints should be utilized.  (Doc. 127 ¶ 249).  Most often, restraints were used when inmates were combative or posed a risk of self-harm.  (Doc. 127 ¶ 244).  The general practice was for inmates to be provided with water or toileting upon the inmate's request.  (Doc. 127 ¶ 250).  Aside from temporary releases, inmates would be released from restraints when they were no longer at risk to attempt the behavior that caused them to be placed in the restraints to begin with.  (Doc. 127 ¶ 247).  Necessarily, this too required the exercise of some discretion.

After being secured in the chair, Stanfill was taken to cell J-14.  J-14 is a non-padded cell, with a glass-paneled door allowing those outside the cell to see in, and vice versa, without having to physically enter the cell.  Inside J-14, there is a sink, a toilet, and a bed space.  (Carrick Dep. at 41).  Activity in J-14 is captured on a motion-activated camera and displayed on a monitor in the nearby intake area.  Wheat and

---

[4] According to Wheat, the handcuffs and leg irons were used because inmates have been known to break free of the Velcro straps used to secure inmates' hands and feet.  (Wheat Dep. at 64-65).

Carrick concluded that because the intake area had multiple officers and because everything would be caught on camera, Stanfill would be kept under close observation. (Doc. 127 ¶ 100).  Wheat ordered the detention officers on duty to check on Stanfill every 15 minutes, and Corporal Donald Lester repeated this directive to the officers in the intake area.  (Doc. 127 ¶ 106).

To this point, the events of Stanfill's incarceration are largely undisputed. However, the events occurring after this time, from about 6:30 p.m. on July 2 until approximately 6:30 a.m. on the morning of July 3, are almost entirely in dispute.  The reason for the factual dispute is that portions of the video recording from when Stanfill was restrained in cell J-14 and from when he was later moved to cell J-15 are unavailable.  The subject of the missing video has been one of much disagreement among the parties and one of concern and frustration for the Court.

After viewing those portions of the video that do remain, the Plaintiff filed a Motion for Sanctions (Doc. 54) on June 20, 2011, alleging that the unavailable video was the result of the Houston County Defendants', Defendant Holt's in particular, failure to preserve the video.[5]  In short, the Plaintiff argues that Defendant Holt intentionally destroyed the video or allowed the video to be destroyed because the evidence might have portrayed events harmful to the Defendants' case.  As a sanction for the alleged spoliation, the Plaintiff asks the Court to apply an adverse inference presumption when ruling on the Motions for Summary Judgment and to infer that events the Defendants claim occurred but that are not depicted on the existing video did not in fact occur.  For

_____

[5] On September 9, 2011, the Court convened a hearing on the Plaintiff's Motion for Sanctions. (Doc. 75).  At that hearing, counsel for the Plaintiff conceded that sanctions, if appropriate, would apply only against the Houston County Defendants and not Southern Health Partners. (Doc. 75 at 82-83).

reasons discussed in more detail below, the Court finds that there was no spoliation of evidence and that an adverse inference is not appropriate.[6]  Because the Plaintiff is not entitled to an adverse inference, the Court will continue its factual analysis using the materials available in the record, which include the existing video and the affidavits and deposition testimony of the parties and additional witnesses.  The Court will, of course, still resolve all reasonable inferences in the Plaintiff's favor.

While in J-14, Stanfill began trying to hit his head on both the back of the chair and the sink.  Wheat and Lester decided to place a foam helmet on Stanfill's head to prevent him from injuring himself.  Because the chin strap was broken, the helmet was secured to Stanfill's head using medical tape.  (Colston Dep. at 41).[7]  At approximately 8:40 p.m. on July 2, Stanfill was moved from J-14 to J-15, which is a padded cell with no obstructions and, like J-14, has a glass-paneled door allowing those outside the cell to see in without having to physically enter the cell.  (Doc. 127 ¶ 120).  During the move from J-14 to J-15 and throughout the night, various officers heard Stanfill shouting, both about his restraint in the chair and simply in conversation with other officers.[8]  (Oates Dep. at 43-45).  According to Nurse Colston, at approximately 10:00 p.m., she was called by Sergeant Wheat to check on Stanfill.  (Colston Dep. at 43).  Although not

---

[6] As will be discussed, even if the Court had found spoliation, the Plaintiff vastly overestimates the scope of any adverse inference he would receive.

[7] As an example of the Plaintiff's misunderstanding of the adverse inference, the Plaintiff claims that medical tape being used to secure the helmet "is not shown on the video and is subject to the adverse inference," yet he never explains what inference he wants drawn.  (Doc. 127 ¶ 110).  Then, he later claims the helmet was taped to Stanfill's head not for his protection, but rather to punish him.  Thus, on numerous occasions, the Plaintiff asserts the adverse inference, but then later contradicts that assertion by using to his advantage the statement he claims is "subject to the adverse inference."

[8] Deputy Collins remembered hearing Stanfill yell that he could not breathe and that he was thirsty.  (Collins Dep. at 13).

shown on the video, Nurse Colston claims she checked Stanfill's vital signs and confirmed that the restraint straps and helmet did not impede Stanfill's breathing. (Colston Dep. at 95).  Despite claiming that he could not breathe, Stanfill showed no signs of abnormal breathing and was "alert, oriented, and cooperative."  (Colston Dep. at 96).  Nurse Colston did not document her medical findings from the 10:00 p.m. check.

From 10:00 p.m. until 12:00 a.m., officers performed their scheduled checks on Stanfill, allegedly by looking into J-15 from outside the cell, four separate times.  (Doc. 76-2).  Although Wheat directed that checks be performed in 15-minute intervals, occasionally over 45 minutes would pass between checks.  (Doc. 76-2).  Sometime between 12:00 and 1:00 a.m. on July 3, Nurse Colston again checked on Stanfill by looking in through the glass window.  (Colston Dep. at 62).  According to Colston, she watched Stanfill for a few minutes, and he was sitting in the chair and seemed alert. (Colston Dep. at 62).

At approximately 3:30 a.m., Wheat and Serrano responded to a call that Stanfill claimed he had urinated and defecated on himself.  Stanfill was removed from the restraint chair, and Stanfill, the chair, and the cell were cleaned using a hose that connects to a water faucet outside of J-15.  According to Wheat, there was no evidence that Stanfill had in fact used the bathroom as he had claimed.  (Wheat Dep. at 80-81). The actual "shower" is not shown on the video, but the subsequent cleaning of cell J-15 is.  While the cell was being mopped, Stanfill can be seen lying naked on the floor of the cell, stretching or moving his legs around.  According to Wheat, Stanfill was out of the chair for approximately 30 minutes.  During this time, the foam helmet was still taped to his head.  (Stanfill Video 3 at 17:00-24:00).  As can be seen on the video, Stanfill was

then dressed in a clean suicide smock and placed back in the restraint chair by Wheat and Serrano.  Wheat then removed the helmet from Stanfill's head and remained in the cell for a few minutes while Stanfill drank water from a cup.  (Stanfill Video 3 at 38:00-42:00).

A few minutes later (at the 47:00 mark on Stanfill Video 3), Wheat re-entered the cell with Nurse Colston.  Wheat thought Stanfill's speech may be slurred, and he wanted Nurse Colston to determine if anything was medically wrong.  (Doc. 127 ¶ 155). Nurse Colston can be seen checking Stanfill's blood pressure and pulse and, though the video has no sound, apparently talking with Stanfill.  Stanfill's blood pressure was 120/60 and he had a pulse rate of 72, both within normal limits, and Colston detected no slurred speech.  (Colston Dep. at 59-60).  In Nurse Colston's presence, Wheat gave Stanfill more water, which he drank with no difficulty.  (Stanfill Video 3 at 50:00-51:35; Colston Dep. at 59).  Neither Wheat nor Serrano had any further interaction with Stanfill. (Doc. 127 ¶ 170).  Between 4:00 a.m. and 5:56 a.m., Stanfill was observed five separate times by Officer Allysia Allen.  (Doc. 76-2).  At no point from 6:30 p.m. on July 2 when Stanfill was first restrained up until the shift change at 6:00 a.m. on July 3 did any nurse suggest to any of the Houston County Defendants that Stanfill be treated differently. (Doc. 127 ¶ 167).

At approximately 6:00 a.m. on July 3, the night shift was relieved of duty and Lieutenant Garrett came on duty as the day-shift supervisor.  (Doc. 127 ¶ 182).  Also starting his shift was Detention Officer Chris Deaton, who is not a Defendant in this action.  Deaton observed Stanfill in J-15 at approximately 6:15 a.m.  According to Deaton, Stanfill appeared to be breathing, but his head was tilted forward and he looked

as if he was sleeping.  (Doc. 127 ¶ 184).  At 6:30 a.m., Deaton again checked on Stanfill

and found him unresponsive in the chair.[9]  (Doc. 127 ¶ 185).  After entering the cell,

Deaton nudged Stanfill with his foot and, when he did not respond, reached under

Stanfill's chin and lifted his head.  Stanfill's head fell back down, and Deaton then

discovered that Stanfill was not breathing.  (Doc. 127 ¶ 185).  Deaton can be seen

calling out to Deputy James Collins, the booking clerk on duty and a trained first

responder (meaning he is trained in CPR and basic first aid).  A moment later Collins

entered the cell and checked Stanfill's carotid artery but did not detect a pulse.  He then

checked Stanfill's mouth for an obstruction but found nothing.  While Stanfill lied

motionless in the chair, Collins and Deaton exited the cell, apparently waiting on a nurse

to arrive.  One minute later, Nurse Sumler arrived with a defibrillator AED and a bag-

valve mask, also known by the proprietary name Ambu bag.  While Nurse Sumler

worked on Stanfill, Collins and another officer can be seen unfastening the restraint

chair straps, albeit slowly and unsuccessfully.  During the first six minutes after finding

Stanfill unresponsive, he was never removed from the chair.  Stanfill Video 1 ends just

as Nurse Sumler is applying the bag-valve mask to Stanfill.  According to Collins, they

"bagged him" for several minutes but were unable to resuscitate.  EMS arrived shortly

thereafter, but their efforts were also unsuccessful.  Nurse Sumler concluded that

Stanfill was dead when she arrived.  (Doc. 127 ¶ 192).  Stanfill was pronounced dead at

6:39 a.m. on July 3, 2008.  The medical examiner determined that Stanfill died of a

sudden cardiac dysrhythmia (a sudden heart attack), with dehydration and microcytic

anemia as contributing factors.

---

[9] The discovery of Stanfill's death and the initial resuscitation efforts were captured on camera
and appear on Stanfill Video 1.

Major Holt was not at HCDC on July 2 or 3, and he had no direct involvement with Stanfill during the events in question.  Holt was first informed of Stanfill's detention and subsequent death on the morning of July 3.  After learning of Stanfill's death, Holt contacted Sheriff Talton, who instructed Holt to follow the ordinary investigative procedure.  (Doc. 127 ¶ 281).  Holt then alerted the Georgia Bureau of Investigation to the incident, which arrived at HCDC shortly thereafter to begin its investigation.[10]  The GBI ultimately determined that Stanfill's death was not the result of any criminal action or inaction.

## II.  Summary Judgment Standard

Summary judgment must be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material facts and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)).  The district court must "view all evidence in the light most favorable to the nonmoving party, and resolve all reasonable doubts about the facts in its favor."  *Id.*  The burden rests with the moving party to prove that no genuine issue of material fact exists.  *Id.*

If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact or that the moving party is not entitled to

---

[10] The Court will discuss Major Holt's actions involving the video recording system in more detail below.

judgment as a matter of law.  *Celotex v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(e).  This evidence must consist of more than mere conclusory allegations or legal conclusions.  *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).  Ultimately, summary judgment must be entered when "the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof."  *Celotex*, 477 U.S. at 323.

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion.  *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005).  "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed."  *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984). The Court will consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration.  *Am. Bankers Ins. Group*, 408 F.3d at 1331.

### III. Discussion

#### A.    Spoliation

As discussed above, the Plaintiff moved for sanctions alleging that the unavailability of portions of video from when Stanfill was housed in J-14 and J-15 was the result of the Houston County Defendants', and Defendant Holt's in particular, failure to preserve the video.  In short, the Plaintiff argues that Defendant Holt intentionally destroyed the video or allowed the video to be destroyed because the evidence might have portrayed events harmful to the Defendants' case.  As a sanction for the alleged

spoliation, the Plaintiff has asked the Court to draw an adverse inference regarding the missing video when ruling on the pending Motions for Summary Judgment.

Because the Plaintiff seeks spoliation sanctions against only the Houston County Defendants, and because the Plaintiff's claims against those Defendants are premised on federal-question jurisdiction, federal law governs whether the imposition of sanctions is appropriate.[11]

Spoliation is the "destruction or significant alteration of evidence, or the failure to preserve property for another's use in pending or reasonably foreseeable litigation." *Graff v. Baja Marine Corp.*, 310 Fed. Appx. 298, 301 (11th Cir. 2009) (internal quotations and citations omitted).  Federal courts have broad discretion to impose spoliation sanctions against litigants as part of their inherent power to manage their own affairs.[12]  As the party seeking sanctions, the Plaintiff has the burden of proof.  To meet this burden, the Plaintiff must prove that the missing evidence existed at one time; that the alleged spoliator had a duty to preserve the evidence; and that the evidence was crucial to his case.  *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 770 F. Supp. 2d 1299, 1305 (N.D. Ga. 2011).  If it is found that evidence has in fact been spoliated, the

---

[11] In *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939 (11th Cir. 2005), the Eleventh Circuit held that federal law governs the imposition of sanctions in diversity-jurisdiction cases as well because "spoliation sanctions constitute an evidentiary matter."  427 F.3d at 944.  The court, however, relied on Georgia state spoliation law for "guidance" due to the lack of specific federal precedent.  *Id.*

[12] The Defendants claim that Federal Rule of Civil Procedure 37 is dispositive of the spoliation issue.  Rule 37 provides another avenue for the imposition of spoliation sanctions.  Under Rule 37(e), "a court may not impose sanctions … on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system" absent extraordinary circumstances.  However, the Plaintiff has not moved for sanctions under Rule 37, and, in any event, the Plaintiff's point is that the video was lost not as a result of the "good-faith operation of an electronic information system," but rather because of Holt's knowing failure to preserve the video before it was overwritten.

Court must then decide whether sanctions are warranted and if so, what sanctions to impose. In making this determination, the following five factors should be considered: (1) whether the movant was prejudiced as a result of the destruction of evidence; (2) whether the prejudice could be cured; (3) the practical importance of the evidence; (4) whether the alleged spoliator acted in good or bad faith; and (5) the potential for abuse if expert testimony about the evidence is not excluded. *Flury*, 427 F.3d at 945.

The degree or nature of bad faith necessary for the imposition of spoliation sanctions is not entirely clear. The Eleventh Circuit has said that the "key to unlocking a court's inherent power [to sanction spoliation] requires a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998). Thus, even though other factors supporting a finding of spoliation may be present, "an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith." *Bashir v. AMTRAK*, 119 F.3d 929, 931 (11th Cir. 1997) (per curiam). Yet in *Flury*, the Eleventh Circuit held that bad faith was only a factor to consider, leading at least one district court to conclude that the Eleventh Circuit no longer strictly requires proof of bad faith as an essential element of spoliation. *See Brown v. Chertoff*, 563 F. Supp. 2d 1372, 1381 (S.D. Ga. 2008). Other district courts have rejected this interpretation of *Flury*. *See Managed Care Solutions, Inc. v. Essent Healthcare, Inc.*, 736 F. Supp. 2d 1317, 1328 n.16 (S.D. Fla. 2010); *Woodard v. Wal-Mart Stores East LP*, 801 F. Supp. 2d 1363, 1372 (M.D. Ga. 2011). While the degree of bad faith necessary to impose sanctions may not be entirely clear, it is clear that simple negligence is not enough but actual malice is not required. *See, e.g., Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009) (noting that malice is not required for

finding of bad faith); *Bashir*, 119 F.3d at 931 (holding that more than "mere negligence"
in losing or destroying evidence is required to sustain an inference of consciousness of
a weak case); *Preferred Care Partners Holding Corp. v. Humana, Inc.*, 2009 WL 982460
at *7 (S.D. Fla. 2009) (finding even "grossly negligent" conduct insufficient to support
finding of bad faith).

As noted, the Eleventh Circuit in *Flury* looked to Georgia law for guidance in
defining the elements of spoliation and, in the process, arguably diminished the role of
bad faith in spoliation analysis.  Subsequent to *Flury*, in *AMLI Residential Props., Inc. v.
Ga. Power Co.*, 293 Ga. App. 358, 667 S.E. 2d 150 (2008), the Georgia Court of
Appeals held that spoliation sanctions may be appropriate even when the spoliator has
not acted in bad faith.  Nevertheless, the court made clear that the relative culpability of
the parties is important.  The court contrasted, on the one hand, "'the accidental,
random, or unintended dissipation of evidence by persons having no interest in its
preservation,'" with, on the other hand, those cases in which "'a party knowledgeable of
litigation strategy, tactics, and policies … acted *unfairly* to preclude the opportunity of an
adversary to be apprised of the existence of a defense to a plaintiff's claims.'"  *AMLI*,
293 Ga. App. at 363, 667 S.E. 2d at 155 (quoting *N. Assurance Co. v. Ware*, 145 F.R.D.
281, 284 (D. Me. 1993)).  This would explain the Eleventh Circuit's decision in *Flury*.
While the plaintiff in *Flury* may not have acted in bad faith when he destroyed the
automobile that was the subject of his products liability claim, he nevertheless unfairly
deprived the defendant of an opportunity to adequately defend its interests.  *See also
Graff*, 310 Fed. Appx. at 301 (affirming the exclusion of the results of destructive testing

of critical evidence when the defendants were not present for the testing and, because of its destruction, had no opportunity to perform their own tests).

As a practical matter, notice of the need to preserve the evidence is critical; it is difficult to assign blame for the destruction of evidence when a party had no reason to know the evidence needed to be preserved.  Hence, it is common for lawyers to send "spoliation letters" to potential adverse parties at the earliest possible moment.  These letters advise of the possibility of litigation and request the preservation of evidence. Generally, it is difficult to argue good faith when evidence is destroyed after the receipt of such clear notice.

The events surrounding the alleged spoliation are as follows.  After Stanfill was discovered unresponsive on the morning of July 3, 2008, Holt was contacted and informed of Stanfill's death.  Holt then contacted Sheriff Talton, who instructed Holt to follow the ordinary investigative procedure.  (Doc. 127 ¶ 281).  As part of the ordinary investigative procedure, Holt alerted the Georgia Bureau of Investigation, and the GBI arrived at HCDC at approximately 8:00 a.m. to begin its investigation.

At the September 9, 2011, sanctions hearing, Holt explained some details of the HCDC recording system.[13]  The surveillance cameras in cells J-14 and J-15 are motion activated.  Both cameras feed into and are recorded onto a digital video recorder, or DVR, which is located in the "central control" area.  Major Holt then has the capability to download from his personal computer in his office portions of the recordings that are captured on the DVR, and then view and/or make copies of the downloaded videos. The HCDC recording system automatically overwrites old video with new video.  (Holt Dep. at 30-31).  Thus, any video not downloaded or otherwise preserved will be

---

[13] A transcript of the spoliation hearing is located at Doc. 75.

overwritten and permanently lost within two to three months.  (Holt Dep. at 111).  HCDC

does not have in place any video retention policy requiring it to preserve certain

recordings for a specified period of time.

     Once Holt arrived at HCDC on the morning of July 3, he went to his office and

began the process of downloading portions of the video of Stanfill from J-15 for the GBI

to use in its investigation.  According to Holt, he had to choose a start and end point of

the video, and he did so, he claims, based on what he thought would be "relevant" to

the GBI's investigation.  (Doc. 75 at 44).  The portions Holt claims he chose to download

were from approximately 8:00 or 10:00 p.m. on July 2 until Stanfill was found

unresponsive around 6:30 a.m. on July 3.  After he downloaded certain portions of the

video to his personal computer, Holt reviewed the video with several GBI agents and

then copied two of the downloaded segments to a DVD, those identified as Stanfill

Video 1 and Stanfill Video 2, and provided the DVD to the GBI.  A third segment of

video, identified as Stanfill Video 3, was not copied to DVD until later, and the GBI

finally picked up this DVD in December 2008.  Stanfill Video 3 also contains several

technical abnormalities, such as split-screens and color irregularities.  According to Holt,

the GBI never asked him for video recordings to begin with, nor did they ask for

additional video evidence other than what he gave them.[14]  The original video was lost

due to the system's automatic overwriting function sometime in October 2008, a result

Holt admitted he knew would occur.

     It is undisputed that there was no effort to preserve certain portions of the video

from when Stanfill was restrained.  For example, Holt did not attempt to download video

from when Stanfill was in cell J-14 and the foam helmet was taped to his head—from

---

[14] No party offered any testimony or evidence from the GBI with regard to the retention of video.

approximately 6:00 p.m. until 8:30 p.m.—or video after it was discovered Stanfill had died at 6:30 a.m. the following morning. As noted above, Holt did not think these events were relevant to the GBI's investigation, as he "was concerned about the cause of [Stanfill's] death." (Doc. 75 at 44). Also undisputed, and of particular concern to the Court, is the fact that certain events the Defendants claim occurred during Stanfill's restraint are not depicted on the video that has been produced. Because the cameras in J-14 and J-15 are motion-activated, it is understandable that there is not a continuous 12-hour recording of Stanfill from 6:30 p.m. until 6:30 a.m.[15] However, Nurse Colston's alleged 10:00 p.m. medical check and Stanfill's shower at 3:30 a.m. certainly produced sufficient movement to activate the camera, yet these events do not appear on any of the three segments of video. Holt did not offer an explanation for the shower not being depicted. (Doc. 75 at 44). While the Plaintiff attributes the dearth of video to Holt's "cherry-picking" only the favorable portions of the video to provide to the GBI, there is no direct evidence that Holt tampered with the evidence.

Here, although the Court recognizes the hardship and prejudice the Plaintiff faces in not having potentially favorable video evidence to assist his case, there are several issues that, when considered together, preclude the imposition of spoliation sanctions in his favor. First, the Plaintiff has not established that the Houston County Defendants had a duty to preserve any video, much less the additional video that was not provided to the GBI and that was later overwritten. Generally speaking, a party has a duty to preserve evidence only when litigation is pending or reasonably foreseeable. *Graff*, 310 Fed. Appx. at 301. The Houston County Defendants claim they did not reasonably anticipate civil litigation resulting from Stanfill's death either at the time Holt

---

[15] In total, there exists approximately one hour of video.

copied the video or any time before the video was overwritten in October 2008.  Though

debatable, this argument has some merit.  The Plaintiff did not file suit until June 30,

2010, almost two years after Stanfill's unfortunate death, and the Defendants were not

served with process until July 7, 2010.  Moreover, there is no evidence in the record that

the Plaintiff requested that the Defendants impose a litigation hold or provided the

Defendants any form of notice that litigation was imminent or even contemplated until

the lawsuit was actually filed.  In other words, there was no spoliation letter.  Though the

argument can be made that litigation is reasonably foreseeable any time an inmate dies

while in custody, that is clearly not always true, and the Court is unwilling to draw that

inference under the specific circumstances of this case.  *See Kraft Reinsurance Ir., Ltd.,*

*v. Pallets Acquisitions, LLC*, 2011 WL 5386421 at *11 (N.D. Ga. 2011) (citing Georgia

state spoliation law for the proposition that, to be reasonably foreseeable, "litigation

must have been contemplated—mere awareness of potential liability is insufficient to

trigger a duty to preserve evidence").

Second, even if there was a duty to preserve the video, the Plaintiff has not

established that that duty was owed to the Plaintiff.  In *In re Delta/Air Tran Baggage Fee*

*Antitrust Litig.,* the court rejected the plaintiffs' "shifting duty" argument that a CID issued

to Delta by the DOJ to preserve and produce all relevant documents imposed upon

Delta a preservation duty that Delta owed not only to the DOJ but also to any potential

third party:

> To be sure, upon receipt of the CID, Delta had a duty to the *DOJ* to
> preserve and produce all relevant documents.  However, the Court has
> difficulty accepting the notion that at that time, as a matter of law Delta
> immediately owed the same duty to *Plaintiffs*….  [W]hen Delta received
> the CID, it cannot be said that Delta should have anticipated this lawsuit.
> Consequently, Delta owed no preservation duty to Plaintiffs that it could

have breached.  If Delta failed to comply with the CID, the DOJ—not Plaintiffs—is the appropriate party to take action.

770 F. Supp. 2d at 1308 (emphasis in original).

Similarly, here, the Plaintiff claims the GBI investigation into Stanfill's death triggered a duty to preserve the video.  The Court disagrees.  Somewhat surprisingly, there is no evidence that the GBI issued any type of litigation hold to Holt or anyone at HCDC to preserve all potentially relevant evidence relating to Stanfill's death.  However, like in *In re Delta*, even if Holt did have such a duty, that duty was likely owed only to the GBI.  The Plaintiff points to Holt's admission that he was aware that the GBI investigation could lead to a criminal prosecution as evidence that litigation was reasonably foreseeable, but this alone does not establish that any duty was owed to the Plaintiff.  The mere investigation into Stanfill's death, which apparently is routine procedure following an in-custody death, does not necessarily mean that Holt should have at that time anticipated litigation with the Plaintiff, nor does it mean that the Plaintiff can take advantage of the duty to preserve evidence, if there was one, Holt owed to the GBI.[16]  The Court is not aware of any decision by a court in this circuit adopting the "shifting duty" argument urged by the Plaintiff, and on the facts here, this Court declines the opportunity to be the first.  *See Point Blank Solutions, Inc. v. Toyobo Am., Inc.*, 2011 WL 1456029 at *24-26 (S.D. Fla. 2011) (rejecting the shifting duty theory as "incompatible with the basic rule that a duty is owed to a specific party").

---

[16] In *Swofford v. Eslinger*, 671 F. Supp. 2d 1274 (M.D. Fla. 2009), the court stated in dicta that a law enforcement investigation into an incident was relevant to whether the defendants had a duty to preserve evidence.  671 F. Supp. 2d at 1278.  However, in addition to the law enforcement investigation, there was also a pending lawsuit, and the plaintiffs had issued multiple requests to the defendants that all relevant evidence be preserved.  Thus, while not cited by either party, *Swofford* is distinguishable on these grounds.

Finally, even if the Houston County Defendants owed a preservation duty to the Plaintiff, the Plaintiff has not met his burden of showing that Holt or any other Defendant acted in bad faith.  Even in the absence of a spoliation letter or other direct notice to Holt to preserve the video, the evidence on this issue is not all in Holt's favor.  First, the Court is not convinced that Major Holt is as naive as he portrayed himself to be at the sanctions hearing.  While the transcript of the hearing speaks for itself, as jail administrator, the Court remains suspicious of Holt's strained recollection of the events leading up to and including Stanfill's death, surely a memorable event, and of what events are depicted on the remaining video.  In addition, Holt's claimed familiarity with the HCDC recording system, which has been in place for almost ten years, is elementary at best and, if true, is disconcerting.  While the Court would not expect Holt to be an expert on all the technical aspects of the recording system, as the jail administrator, he should, and perhaps might, possess more than the novice understanding he represented to the Court.

The Court is particularly concerned with Holt's incriminating and cynical testimony at the coroner's inquest[17] on October 15, 2009, when asked about the absence of time and date stamps on the video:

> **JUROR**:  Well I would recommend that you get time stamps on that.  They even put time stamps on the 7-11 stores.
>
> **HOLT**: That's a great idea, but once again, I'm in the jail business and I have a video system in house.  It may not meet your standard or what you think needs to be desired.  I'd like to have that time too, but at that time, that was the system I was working with, and if I ever get a bundle of

---

[17] The Court is aware that coroner's inquests are sometimes used, properly, to obtain information in preparation for litigation.  If the Plaintiff did that here, one would think there would have been some indication to Holt that litigation was likely.  However, the coroner's inquest was apparently initiated long after the video had been destroyed.

money, then we are going to make some changes that we are going to be able deal with after.  Then I'll have the time.

**JUROR**:  Well, I would think you need that just to prevent lawsuits.  I mean, it could be - -

**HOLT**: *Well, I have got the video system and the way the law is practiced, is if I don't have video, then I don't have a problem, but if I have got video, I have got to use it.*  And I have got what I work with.  And that's what you saw.  And you are just going to have to trust me and about a dozen other people who were there that evening that are here to testify that they can give you the time line which you are inquiring about.

        Unlike a convenience store, where the clerk may have been shot and you are sitting there with a question of when did this happen, I have got a multitude of people right outside the door that will raise their hand and swear truthfully that they can tell you what time everything occurred better than that video is going to show you.  They can sit there and you can question them and all of them will verify each other independently and follow that same time line.  So you feeling about the video would be a good thing to have, but I have got something that I feel is probably better than the video that supports and explains.

Doc. 79-4 at 7-8 (emphasis added).[18]  While Holt offered an explanation for his statement that "the way the law is practiced, is if I don't have video, then I don't have a problem, but if I have got video, I have got to use it," the statement is certainly capable of a less noble interpretation.

    Also problematic to the Plaintiff's request for spoliation sanctions is his failure to clearly assert what adverse inference should be drawn from the missing video.  Although he asserts that certain factual elements of the case are "subject to the adverse inference," his summary judgment briefs do not clearly show how any adverse inference should impact the Court's summary judgment analysis.  An adverse inference does not amount to free reign to advance elaborate theories, unsupported by the available evidence, of what the spoliated evidence may have shown.  At most, the strongest

---

[18] The juror's question about the absence of time stamps on the remaining video is a good one, particularly when a "still-shot" from the surveillance camera is time-stamped.  Neither Holt nor his lawyer was able to explain this to the satisfaction of the Court.

inference that could apply here would be that, if preserved, the video would not have shown several activities the Houston County Defendants said occurred but that are not depicted on the remaining video, e.g., the provision of water to Stanfill at 10:00 p.m. and his removal from the chair and shower at 3:30 a.m.  Thus, even applying an adverse inference does not automatically get the Plaintiff by summary judgment.

Despite the Court's significant concerns over the unavailable video, the Court is nonetheless unable to conclude based on this very circumstantial evidence that Holt's conduct was sufficiently culpable to constitute spoliation of evidence.  In the absence of a spoliation letter from the Plaintiff or any other notice of the possibility of a claim by Stanfill's survivors, the only arguable relevance of the video at the time it was overwritten was to assist the GBI in its criminal investigation.  It is conceivable, and perhaps even likely, that the scope of a GBI criminal investigation, and therefore what is and is not helpful to such an investigation, is materially different than what would be relevant or helpful in a civil case alleging various constitutional violations.  Also noteworthy is the GBI's report from the day of Stanfill's death that the medical examiner had found no notable causes of death.  (Doc. 77-4).  Thus, notwithstanding the Court's skepticism regarding Holt's coroner's inquest testimony, his assertion that he was only concerned with Stanfill's cause of death and that he had no reason to anticipate future litigation over the matter is worthy of some credence.  Although Holt likely should have ensured that the video was preserved in its entirety, his failure to do so suggests only negligence, and mere negligence is insufficient to support spoliation sanctions in this circuit.  *Bashir*, 119 F.3d at 931.  As noted, it is the Plaintiff's burden to prove that he is

entitled to the extraordinary relief he seeks, and he has not carried his burden.

Accordingly, the Plaintiff's Motion for Sanctions is **denied**.

> **B.    Official Capacity Claims and Eleventh Amendment Immunity**

The Plaintiff asserts both official and individual capacity claims against each of the Houston County Defendants.  All of these Defendants contend that they are entitled to Eleventh Amendment immunity for the section 1983 claims against them in their official capacities.  The Plaintiff did not address the issue of Eleventh Amendment immunity in his response to the Defendants' Motion.

Generally, absent a waiver by the State or valid congressional override, the Eleventh Amendment bars suits against a State or one of its agencies, departments, or officials when the State is the real party in interest or when monetary recovery would essentially be paid from State funds.  *DeKalb Cnty. Sch. Dist. v. Schrenko*, 109 F.3d 680, 688 (11th Cir. 1997).  Under this principle, "a suit against a governmental officer in his official capacity is the same as a suit against [the] entity of which [the] officer is an agent."  *McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781, 785 n. 2 (1997) (internal quotations and citation omitted) (alteration in original).

Under Georgia law, sheriffs are state officials for Eleventh Amendment purposes. *Manders v. Lee*, 338 F.3d 1304, 1328 (11th Cir. 2003) (holding that the sheriff "in his official capacity is an arm of the state, not [the] County, in establishing use-of-force policy at the jail and in training and disciplining his deputies in that regard").  Thus, Sheriff Talton is entitled to Eleventh Amendment immunity against official capacity claims.  Moreover, sheriff's deputies, as employees of the sheriff, are entitled to the same Eleventh Amendment immunity as the sheriff.  *Carr v. City of Florence, Ala.*, 916

F.2d 1521, 1527 (11th Cir. 1990).  Accordingly, Defendants Holt, Wheat, Carrick,

Lester, Serrano, Oates, Collins, and Garrett are also entitled to Eleventh Amendment

immunity from claims brought against them in their official capacities.

### C.    Individual Capacity Claims

The Plaintiff also brings claims under 42 U.S.C. § 1983 against the Houston

County Defendants in their individual capacities.  Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, shall be
> liable to the party injured in an action at law, suit in equity, or other proper
> proceeding for redress.

42 U.S.C. § 1983.  Section 1983 itself does not create any protected rights, but instead

provides a remedy for constitutional violations committed under color of state law.  The

relevant inquiry under section 1983 then is whether a right secured by the Constitution

has been violated.  Even if a constitutional violation has occurred, however, a defendant

may still be protected by qualified immunity.  "Qualified immunity offers complete

protection for individual public officials performing discretionary functions 'insofar as

their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known.'"  *Sherrod v. Johnson*, 667 F.3d 1359,

1363 (11th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "The

purpose of this immunity is to allow government officials to carry out their discretionary

duties without the fear of personal liability or harassing litigation, protecting from suit all

but the plainly incompetent or one who is knowingly violating federal law."  *Lee v.

Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotations and citation omitted).

A threshold determination in a qualified immunity analysis is whether the official was acting within the scope of his discretionary authority when the alleged constitutional violation occurred.  *Case v. Eslinger*, 555 F.3d 1317, 1325 (11th Cir. 2009).[19]  If a defendant establishes that he was performing a discretionary function, the burden shifts to the plaintiff to demonstrate (1) that there was a violation of a constitutional right and (2) that the constitutional right was clearly established at the time of the incident. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The Supreme Court has stated that district courts and courts of appeals have discretion in deciding which of these two prongs to address first.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).[20]

Before addressing the substance of the Plaintiff's claims and whether the Defendants are entitled to qualified immunity, the Court must determine the appropriate constitutional standard to apply.  The Plaintiff's Complaint and briefs invoke the protections of both the Eighth and Fourteenth Amendments.  Indeed, both the Eighth and Fourteenth Amendments provide protection from the use of excessive force by government officials.  However, the Eighth Amendment applies only to individuals who have been convicted of a criminal offense.  Here, Stanfill was a pretrial detainee and had not yet been convicted of any offense.  The Eighth Amendment is therefore

---

[19] Here, there is no dispute that the Houston County Defendants were acting within their discretionary authority at the time of the incident.

[20] The Supreme Court's allowance of discretion in deciding which qualified immunity prong to address first has no application in Fourteenth Amendment excessive force claims because the qualified immunity analysis in excessive force claims involves only the first prong.  *Fennell v. Gilstrap*, 559 F.3d 1212, 1217 n. 6 (11th Cir. 2009).  The reasoning for the abridged analysis is that "the subjective element required to establish it is so extreme that every conceivable set of circumstances in which [excessive force] occurs is clearly established to be a violation of the Constitution…."  *Id.* at 1217 (internal quotations and citation omitted).

inapplicable, and the Plaintiff's claims will be analyzed under the Fourteenth Amendment.

Under the Fourteenth Amendment, a pretrial detainee can state a claim (1) that the defendants were deliberately indifferent to his serious medical needs, (2) challenging the conditions of his confinement (which also involves a deliberate indifference analysis), or (3) that the defendants used excessive force.  It is not entirely clear what types of claims the Plaintiff is asserting against the various Defendants.[21] However, upon careful review of the Plaintiff's Complaint and briefs, the Court construes the Plaintiff's Complaint as asserting the following claims: an excessive force claim against Defendants Carrick and Wheat based on their initial placement of Stanfill in the restraint chair (Doc. 1 ¶¶ 52-53); an excessive force claim based on the continued use of the restraint chair (Doc. 1 ¶ 53); claims against Defendants Lester, Serrano, Oates, Collins, and Garrett based on their alleged failure to intervene and remove Stanfill from the restraint chair (Doc. 1 ¶¶ 55-58); claims against Defendants Carrick, Wheat, Lester, Serrano, Oates, Collins, and Garrett for deliberate indifference to Stanfill's serious medical needs (Doc. 1 ¶ 54); and a claim against Defendants Talton and Holt based on a theory of alleged failure to train and failure to institute appropriate policies and procedures (Doc. 1 ¶¶ 46-47).  Because the Defendants were acting within their

---

[21] The Court is not obligated to "distill every potential argument that could be made based upon the materials before it on summary judgment."  *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).  Moreover, grounds not raised in the Plaintiff's Complaint or disclosed during discovery but that are relied upon at summary judgment will not be considered.  *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006).  Because the Court "may not infer claims other than those that plainly appear on the face of the complaint to defeat a defense of qualified immunity," the Court relies primarily on the Plaintiff's Complaint to discern the factual basis of his claims.  *GJR Invs., Inc. v. Cnty. of Escambia, Fla.*, 132 F.3d 1359, 1367-69 (11th Cir. 1998).

discretionary authority at the time of the alleged constitutional violations, the Court's analysis begins with the first step in the qualified immunity analysis: whether there was a constitutional violation.  The Court will address each claim, or set of claims, in turn.

      **i.**    **Excessive Force Claims**

The Plaintiff claims that Defendants Carrick and Wheat used excessive force in their management of Stanfill during the night and early morning of July 2 and 3.  "A jailer's use of force against a pretrial detainee is excessive under the Fourteenth Amendment if it 'shocks the conscience.'"  *Fennell v. Gilstrap*, 559 F.3d 1212, 1217 (11th Cir. 2009) (citation omitted).  "The use of force does not 'shock the conscience' if it is applied 'in a good-faith effort to maintain or restore discipline.'  However, if the force is applied 'maliciously and sadistically to cause harm,' then it does 'shock the conscience,' and is excessive under the Eighth or Fourteenth Amendment."  *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)).

In determining whether the force was applied maliciously and sadistically to cause harm, courts are to consider a) the need for the application of force; b) the relationship between the need and the amount of force that was used; c) the extent of the injury inflicted upon the prisoner; d) the extent of the threat to the safety of staff and inmates; and e) any efforts made to temper the severity of a forceful response.  *Whitley v. Albers*, 475 U.S. 312, 321 (1986); *Hudson*, 503 U.S. at 7.  In making this determination, courts are to "give a wide range of deference to prison officials acting to preserve discipline and security."  *Id.*  The determination "must not be made in the glow of hindsight."  *Griffin v. Troy State Univ.*, 128 Fed. Appx. 739, 742 (11th Cir. 2005) (citation omitted).  Instead, the relevant inquiry is whether the decision by the

government official was egregious, that is, conscience-shocking, at the time the official made the decision. *Id.* "Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain … the case should not go to the jury." *Whitley*, *475* U.S. at 322.

       *a.*    *Need for Application of Force*

The Plaintiff argues that Carrick and Wheat's restraint of Stanfill was unnecessary because Stanfill posed no threat to the safety of other inmates or detention officers. (Doc. 85-9 at 10). The Plaintiff claims the real reason Stanfill was placed in the restraint chair was to "get him out of the way and try to keep him from being an interruption to operations." (Doc. 122-3 at 9). In making this argument, the Plaintiff fails to appreciate that less than one hour before Stanfill was placed in the restraint chair, he had tied a tourniquet around his arm, somehow removed a metal button from his prison jumpsuit, cut his wrist or arm, and sprayed blood across his cell. Even discounting Wheat's claim that Stanfill expressly threatened suicide on July 2, given Carrick and Wheat's familiarity with Stanfill's history of self-mutilation, coupled with his most recent cutting incident on July 2, there was a need for the application of some force. Carrick and Wheat's decision to use force was not unreasonable under the circumstances. *See Campbell v. Sikes*, 169 F.3d 1353, 1374-77 (11th Cir. 1999) (recognizing that use of "L" shaped restraint and straightjacket was a permissible use of force on prisoner who had taken affirmative acts towards harming herself and posed a serious threat of further self-harm).

b.      *Relation Between Need and Amount of Force Used*

The Plaintiff contends that the amount of force used—full restraints, including handcuffs, leg irons, and the foam helmet—was disproportionate to the need.  As the Defendants point out, however, much of the Plaintiff's argument rests on his claim that other, less forceful measures could have been used to prevent any perceived risk of harm.  This argument is misplaced, as "courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of the particular use of force or the existence of arguably superior alternatives."  *Whitley*, 475 U.S. at 322.  As discussed above, Carrick and Wheat reasonably perceived that Stanfill posed a serious threat of injury to himself.  During prior incarcerations, Stanfill had shown the ability to escape from or lessen the effect of various restraints, and he had a tendency to reopen old wounds.  Moreover, inmates have been known to break free of the Velcro straps used to secure their hands and feet, thus necessitating the use of handcuffs and leg irons in addition to the straps built into the chair.  Also, while in cell J-14, Stanfill had attempted to bang his head, prompting Wheat to apply the foam helmet, which he secured to Stanfill using medical tape.  Based on these considerations, the force used was not disproportionate to the need for force, and this factor weighs in favor of the Defendants.

c.      *Extent of Injury Inflicted*

Although the "nature of the force rather than the extent of the injury" is the relevant inquiry in Fourteenth Amendment excessive force cases, the extent of injury is still a "factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation."  *Wilkins v. Gaddy*, __ U.S. __, 130 S. Ct.

1175, 1176-78 (2010) (internal quotations and citation omitted).  In most excessive force cases, the extent of injury caused by the alleged excessive force is apparent.  *See Skrtich v. Thornton*, 280 F.3d 1295, 1302 (11th Cir. 2002) (prisoner suffered multiple rib fractures, back injuries, lacerations to the scalp, and abdominal injuries as a result of beating at the hands of prison officials).  Here, the extent of injury inflicted by the Defendants' use of the restraint chair, the Plaintiff contends, is obvious.  The Plaintiff states in a conclusory fashion that the "extent of injury was death."  (Doc. 122-2 at 18).  To sustain such a theory, however, the Plaintiff must produce evidence that the alleged constitutional violation he complains of caused Stanfill's injuries.  *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1584 (11th Cir. 1995).

The Plaintiff's medical expert regarding cause of death is Dr. Melissa Sims.  Dr. Sims is the regional medical examiner for the Georgia Bureau of Investigation.  She performed an autopsy as part of the GBI's routine procedure following an in-custody death.  After completing the autopsy, Dr. Sims concluded that Stanfill "died as a result of a sudden cardiac dysrhythmia….  A history of microcytic anemia and dehydration [were] contributory factors in th[e] death.  As medical records document that the decedent's anemia was due to his repeated self-cutting, the manner of death in this case is best classified as undetermined."[22]  (Doc. 54-8 at 6).  During her deposition, Dr. Sims stated her opinion, expressed to a reasonable degree of medical certainty, that neither the fact nor duration of Stanfill's restraint played a role in his death.  (Sims Dep. at 93).  According to Dr. Sims, Stanfill died a "sudden unexpected death."  (Sims Dep. at 54).

---

[22] No party contests the methodology or accuracy of Dr. Sims' conclusion regarding Stanfill's cause of death.

Despite this potentially damaging testimony from his own cause-of-death expert, the Plaintiff offers no medical evidence to the contrary.[23]

Dr. Sims did testify that, during the autopsy, she noted the presence of several red abrasions on Stanfill's left forearm arm that were likely consistent with restraints or handcuffs used to secure Stanfill in the chair. (Sims Dep. at 45). While it is also likely that being confined in the restraint chair caused Stanfill some physical discomfort and emotional pain, there is little evidence that the restraints themselves caused Stanfill any physical injury. *Campbell*, 169 F.3d at 1376. Thus, the extent of injury inflicted by the Defendants' use of the restraint chair was minimal and supports a finding that the use of force was not excessive.[24]

> d.    *Extent of Threat to the Safety of Staff and Inmates*

The Plaintiff claims that Stanfill "posed no threat whatsoever to any of the staff or other inmates and, at most, was solely a threat to [himself]." (Doc. 122-2 at 18). The Plaintiff's attempt to downplay the threat Stanfill posed to himself is not persuasive. Although perhaps not violent towards staff or other inmates, Defendants Carrick and Wheat faced a difficult decision involving an unruly inmate with a known history of severe self-mutilation. Under these circumstances, Carrick and Wheat obviously felt that Stanfill needed to be restrained. If Stanfill had not been restrained, and if he

---

[23] The Eleventh Circuit held in *Wingster v. Head*, 318 Fed. Appx. 809 (11th Cir. 2009), that mere temporal proximity between an inmate's death and the alleged excessive force was insufficient to overcome the medical expert's testimony that the inmate's death was not the result of the alleged assault or trauma. 318 Fed. Appx. at 815-16. However, the court did note that the Plaintiff in *Wingster* only asserted a claim for the wrongful death of the inmate, and not for any injuries suffered prior to his death, thus suggesting that the lack causation evidence alone may not be fatal to such a claim. *Id.* at 815 n. 10.

[24] Whether and to what extent Stanfill's reported dehydration supports a claim for relief will be resolved in the Court's deliberate indifference analysis.

followed through on his threat to commit suicide, the Defendants would have likely faced the prospect of a lawsuit claiming they should have protected this suicidal inmate from himself.  As the Fourth Circuit stated, "prison officials must not be forced to walk a tightrope and face the prospect of a lawsuit no matter which way they turn." *Grayson v. Peed*, 195 F.3d 692, 696 (4th Cir. 1999).  It is in precisely these circumstances that prison officials should be accorded deference in their decisions involving prison safety and security.  Accordingly, Stanfill posed a threat to his own safety sufficient to justify Carrick and Wheat's decision to impose restraints.

        *e.*      *Efforts Made to Temper the Severity of a Forceful Response*

There is also evidence that Carrick and Wheat made some effort to temper the severity of their use of force.  After securing Stanfill in the chair, Wheat ordered detention officers to check Stanfill every 15 minutes.  Although the checks were not performed at strict 15-minute intervals, there is evidence that, throughout the night, officers performed visual checks on Stanfill approximately 30 times.  (Doc. 76-2).  Most of these checks were done by peering in through the glass window on the door to the cell.  Thus, even if all of the video had been preserved, the checks would not be visible by viewing the recorded video.  Moreover, Nurse Colston, to whom the adverse inference would not apply even if one was warranted, testified that she physically checked on Stanfill once at approximately 10:00 p.m. on July 2, and then again at approximately 4:00 a.m. on July 3.  According to Nurse Colston, Stanfill's vital signs were normal during both medical checks and, despite his claims of difficulty breathing, his respiration was not obscured.  On multiple occasions between 3:30 and 4:00 a.m., Wheat gave Stanfill water from a Styrofoam cup, which Stanfill can be seen drinking

with no apparent difficulty.  (Stanfill Video 3 at 38:00-42:00 and 50:00-52:00).  In short, even applying an adverse inference, there is sufficient evidence that Carrick and Wheat made a concerted effort to temper the severity of their forceful response.

Considering all these factors together, the Plaintiff has failed to produce evidence that Carrick and Wheat's placement of Stanfill in the restraint chair was anything other than a good-faith effort to protect Stanfill from further self-harm.  Stanfill's penchant for self-mutilation, as well as the specific incident that precipitated a forceful response on July 2, are uncontroverted.  Carrick and Wheat's forceful response therefore does not shock the conscience.  When construed in the light most favorable to the Plaintiff, the evidence does not support an inference that Carrick and Wheat acted with a malicious and sadistic intent to cause harm.  Accordingly, the Plaintiff has not met his burden of proving unconstitutional excessive force, and it necessarily follows that Carrick and Wheat are entitled to summary judgment on qualified immunity grounds.

With regard to the Plaintiff's claim that the use of restraints continued beyond any reasonable need for such measures, the analysis is slightly more complicated. Generally, any continued use of force after the necessity for the application of force ceases can violate the Fourteenth Amendment.  *Williams v. Burton*, 943 F.2d 1572, 1576 (11th Cir. 1991) (rejecting claim that putting a violent inmate in four-point restraint for twenty-eight and one-half hours was excessive force).  However, "[t]he Constitution does not require prison officials to release from restraint a dangerous inmate who has lashed out … simply because he has stopped lashing out for the time being."  *Scroggins v. Davis*, 346 Fed. Appx. 504, 506 (11th Cir. 2009).  Rather, "[h]ow long restraint may be continued calls for the exercise of good judgment on the part of prison officials.

Once it is established that the force was applied in a good faith effort to maintain discipline and not maliciously or sadistically for the purpose of causing harm, the courts give great deference to the actions of prison officials in applying prophylactic or preventive measures" to prevent the incidence of further disturbances. *Williams*, 943 F.2d at 1576. "It is by this observation and management that corrections officials judge, in light of their experience and expertise, whether the plaintiff's violent nature has abated." *Id.* "[F]ederal courts must defer in many matters to the expert judgment of these administrators, particularly in matters of internal security and order." *Id.* (internal quotations and citation omitted).

Here, as instructed by the Eleventh Circuit, the Court must largely defer to the expert judgment of the officers tasked with observing and managing Stanfill during his restraint. Stanfill's unfortunate history was no secret to the Houston County Defendants. Wheat, who was aware of this history, had the most interaction with Stanfill during the events leading up to his death, and likely would have been the one to order his release, was entitled to exercise some discretion in determining when Stanfill no longer posed a threat of self-harm. At approximately 4:00 a.m., Wheat exercised discretionary judgment when he removed the foam helmet after sensing that Stanfill had begun to calm down. (Wheat Dep. at 42-43). As Wheat explained, it "[w]as a give-and-take kind of thing…. I wanted to believe that he didn't want to harm himself, but I wasn't sure, so I wanted to remove the helmet, you know, just back off a little bit at a time to see how he was going to act and how he was going to respond, and like I said, we do just one thing at a time, until finally, you know, he's out of the restraints altogether, and

hopefully by that time medical have had a chance to evaluate him and go from there to do what they need to do to help him." (Wheat Dep. at 42-43).[25]

In light of the Court's finding that Stanfill's initial restraint was prudent and proper, the Court now extends that finding to Stanfill's continued restraint. Stanfill posed a serious risk of harm to himself, and the particular circumstances confronting the officers justified the continued use of the restraints until they were reasonably assured that the situation had abated. Although perhaps more could have been done to ensure that Stanfill experienced no discomfort, the evidence must go "beyond a mere dispute over the reasonableness of the particular use of force or the existence of arguably superior alternatives." *Whitley*, 475 U.S. at 322. In short, the tragedy of Stanfill's essentially unexplained death by itself does not render excessive the measures undertaken in response to Stanfill's behavior. Thus, to the extent the Plaintiff has asserted an excessive force claim based on Stanfill's continued restraint, the Defendants are entitled to qualified immunity and summary judgment in their favor is appropriate.

The Plaintiff has also asserted a claim that Defendants Lester, Serrano, Oates, Collins, and Garrett should have intervened to prevent the use of excessive force. While the Plaintiff is correct that an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another's use of excessive force can be held personally liable for his nonfeasance, such a claim is dependent upon an initial finding of excessive force. *Crenshaw v. Lister*, 556 F.3d 1283, 1294 (11th Cir. 2009). Because the Plaintiff has failed to prove that the use of force was excessive, it

---

[25] The Court recognizes the possibility for after-the-fact rationalizations, particularly in a case such as this, where the Plaintiff is not available to dispute the Defendants' testimony. However, when the applicable standard involves the subjective intent of the alleged participants, testimony from those participants is particularly relevant.

necessarily follows that the Plaintiff's claims against Defendants Lester, Serrano, Oates, Collins, and Garrett based on their failure to intervene also fail.

### ii.    Deliberate Indifference Claims

The Plaintiff has also asserted Fourteenth Amendment deliberate indifference claims against the Houston County Defendants.  Specifically, the Plaintiff contends that the Defendants were deliberately indifferent to Stanfill's physical and mental health needs both prior to and during his restraint.  Because it is not clear against whom this claim is asserted, in an abundance of caution, the Court will address the claim as though it were properly asserted against Defendants Carrick, Wheat, Lester, Serrano, Oates, Collins, and Garrett.  (Doc. 1 ¶¶ 52-58).

To prove his claim, the Plaintiff must prove that Stanfill had an objectively serious medical need; that a Defendant acted with deliberate indifference to that need; and that the Defendant's deliberate indifference caused Stanfill's injuries.  *Mann*, 588 F.3d at 1306-07.  A serious medical need is one that has been "diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the need for medical treatment."  *Id*.  To establish "deliberate indifference," the Plaintiff must show that a Defendant "(1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3) acted with more than gross negligence."  *Harper v. Lawrence Cnty., Ala.*, 592 F.3d 1227, 1234 (11th Cir. 2010).

The "subjective knowledge" component requires that a defendant was "both [ ] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Burnette v. Taylor*, 533 F.3d 1325,1330 (11th Cir. 2008) (internal quotations and citation omitted).  A defendant will

not be held liable for his or her failure to alleviate a risk that should have been perceived but was not. *Id.* at 1331. Thus, "imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference." *Id.* (internal quotations and citation omitted). "Each individual defendant must be judged separately and on the basis of what that person [knew]." *Id.* For reasons set forth in more detail below, the Plaintiff's deliberate indifference claims fail on multiple levels.

        a.   *Mental Health Need*

      The Plaintiff claims that Defendants Carrick and Wheat knew that Stanfill had a severe mental illness and a habit of self-mutilation, yet they failed to adequately address these psychological needs. The Plaintiff further alleges that certain unnamed Defendants allegedly failed to adequately assess Stanfill's mental health needs at the time of his admission to HCDC, as required by HCDC policy. (Doc. 122-1 at 9). Although he does not identify the particular Defendants who failed to abide by the policy, according to the Plaintiff, "the failure to follow policy led to the cutting which, in turn led to [Stanfill's] restraint in the chair and, ultimately, his death." (Doc. 122-1 at 10).

      First, the only objectively serious medical need that Carrick and Wheat (and any other individual Defendant for that matter) were aware of was Stanfill's history of self-inflicted harm. It therefore follows that the only risk of serious harm these Defendants were aware of was the possibility that Stanfill may try to hurt himself. Although there is evidence that Stanfill had been treated for Adjustment Disorder and ADHD at Central State Hospital in February 2008, the record does not support the Plaintiff's argument that Carrick and Wheat (or any of the Houston County Defendants) knew that Stanfill had been diagnosed by a physician with any particular mental illness or that he had, in

the past, been prescribed medication for that illness.[26]  Moreover, other than escorting the nurses during their distribution of medication to inmates, jail officials are generally unaware of inmates' specific medication needs and they do not participate in the diagnosis or treatment of inmate mental health conditions.  (Carrick Dep. at 35-36; 44-45).  A Defendant cannot be deliberately indifferent to a risk of harm he is not aware of.  Accordingly, to the extent the Plaintiff claims that any of the Houston County Defendants failed to provide appropriate medical care (in the form of medication or other treatment) for Stanfill's diagnosed mental disorders, the Defendants are entitled to summary judgment.

Second, assuming that Stanfill's history as a "cutter" constitutes a serious medical need, the Plaintiff has not produced sufficient evidence that any of the Houston County Defendants were deliberately indifferent to that need.  As noted above, the only risk of harm the Houston County Defendants were subjectively aware of was Stanfill's potential to injure himself.  Despite his refusal to speak with medical staff upon arrival at HCDC on June 30, Stanfill was immediately classified as a suicide risk due to his self-destructive history and was placed on suicide watch.  (Doc. 127 ¶ 268).  For two days, Stanfill remained on suicide watch in HCDC custody, whereby he was observed at least every 15 minutes, without incident.  Thus, from the time of his initial booking up until approximately 5:45 p.m. on July 2, there is no evidence of any serious medical need, other than that already being accounted for, warranting the Defendants' attention, and,

---

[26] The Plaintiff admits that neither Stanfill nor anybody from his family provided prescription medication at the time of his June 2008 incarceration.  (Doc. 127 ¶¶ 47-48).  In fact, the Plaintiff, Stanfill's father, admitted that just prior to his incarceration Stanfill told him that he was not taking any medications.  (Stanfill Dep. at 53).

resultingly, no evidence that Stanfill's medical needs, both mental and physical, were not attended to.

The evidence is just as lacking with regard to Stanfill's treatment after he cut himself on July 2.  Following this incident, Stanfill was sent to medical where he was observed by medical staff and his wound was bandaged.  After taking a shower to rinse the blood from his body, Stanfill was dressed in a suicide smock and placed in the restraint chair in J-14.  Again, at this time, the only "serious risk of harm" any of the Houston County Defendants were subjectively aware of was Stanfill's suicide potential, as evidenced by his past and now most recent behavior.  Because Carrick and Wheat took immediate action to prevent this risk of harm from materializing by placing him in restraints, it cannot be said that Carrick, Wheat, or anyone else who assisted in restraining Stanfill disregarded that risk.

> b.    *Physical Medical Need*

With regard to Stanfill's physical medical needs, the Plaintiff claims Defendants Wheat, Lester, Serrano, Oates, Collins, and Garrett knew at 3:30 a.m. "that [Stanfill] was in a completely exhausted and dangerously weak condition and was not physically or mentally fit to spend more time in the restraint chair," but that they were "deliberately indifferent to [his] serious condition and returned him to" or left him in the chair.  (Doc. 1 ¶¶ 54-58).  As discussed above, a serious medical need is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the need for medical treatment.  Because Stanfill had not been diagnosed by a physician with any physical medical need requiring treatment, the Plaintiff may proceed only under the latter definition.  Though the Plaintiff does not identify the

physical "condition" forming the basis of this claim, construed in the light most favorable

to him, the only possible conditions that could support the Plaintiff's theory are

exhaustion, weakness, and dehydration.

Assuming these conditions constitute serious medical needs, there is insufficient

evidence that Wheat and Serrano (who placed Stanfill back in the chair at

approximately 3:45 a.m.) or Lester, Oates, Collins, and Garrett (who were on duty and

observed Stanfill in the chair at various times) were subjectively aware of Stanfill's

medical conditions or the risk of serious harm that could result if left unattended.  To

prove the subjective knowledge element, the Plaintiff must not only prove that a

Defendant was aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, he must also prove that that Defendant actually

drew the inference.  While the Plaintiff points to the video of Stanfill lying on the floor in

J-15 and then being placed back in the chair around 4:00 a.m. as evidence of Stanfill's

alleged obvious "condition," the fact remains that nothing in the record suggests that the

Defendants actually drew the inference that Stanfill's condition could lead to death if not

promptly treated.[27]  (Serrano Dep. at 41: "Q: But you didn't see anything like that where

Stanfill was exhibiting any signs or symptoms that you needed to go get medical for?  A:

No, sir."; Wheat Dep. at 45: "Q: But did he also look to be fatigued?  A: To me, no, sir …

it appeared to me that … he just seemed to be noncompliant."; Greifinger Dep at 174:

"Q: [I]sn't it fair to say that the jailers also didn't know when [Stanfill] became dehydrated

that evening before they found him unresponsive?  A: Correct.").  Whether a "medical

need might be recognizable by a trained medical professional, such as a nurse, is not

---

[27] The Court notes that Stanfill's appearance is not that of a healthy individual.  However, it is
not clear whether Stanfill was exhausted or whether he was simply being noncompliant.

enough.  Instead, the need for immediate medical assistance must have been apparent to the untrained eye of a layperson."  *Youmans v. Gagnon*, 626 F.3d 557, 564 n. 8 (11th Cir. 2010).

Assuming that Stanfill's alleged exhausted state and dehydration constitute objectively serious medical needs and even assuming that the Defendants were subjectively aware of a risk of serious harm, the evidence is similarly lacking that any Defendant was deliberately indifferent to those needs.  To the contrary, after Stanfill was placed back in the chair, he was given water, and at approximately 4:00 a.m. Nurse Colston, at Wheat's request, took Stanfill's blood pressure, checked his pulse and breathing rate, and determined that Stanfill appeared in normal health and needed no further medical care.  After Nurse Colston's 4:00 a.m. medical check, the helmet was removed and Stanfill was given more water.  All of these events are depicted on Stanfill Video 3 and their occurrence cannot be argued.

The Plaintiff must produce evidence that, with knowledge of a substantial risk of serious harm, a Defendant "knowingly or recklessly disregarded that risk by failing to take reasonable measures to abate it."  *Hale*, 50 F.3d at 1583.  This standard requires more than accidental inadequacy, negligence in diagnosing or treatment, or even medical malpractice actionable under state law.  As the Eleventh Circuit stated in *Youmans v. Gagnon*, the "best response to a serious medical need is not required by federal law in these cases."  626 F.3d at 564.  Accordingly, even if, as the Plaintiff argues, the Defendants should have taken steps to "involve appropriate medical personnel and … transfer Stanfill to a [mental health] facility," their failure to do so does not rise to the level of deliberate indifference.

-44-

Finally, as noted above, even if the Plaintiff could prove a Defendant's deliberate indifference to Stanfill's medical needs (which the Court has found he has not), he must also prove causation between that indifference and Stanfill's injuries.  *Mann*, 588 F.3d at 1306-07.  The Plaintiff's attenuated theory that "the failure to follow policy led to the cutting which, in turn led to [Stanfill's] restraint in the chair and, ultimately, his death" is contradicted by the Plaintiff's medical expert's, Dr. Sims, opinion that Stanfill's death was not causally related to his restraint in the chair.  To circumvent this testimony, the Plaintiff cites Dr. Sims' conclusion that dehydration was a contributing factor in Stanfill's death.  The Plaintiff summarily attributes Stanfill's dehydration to his being restrained in the chair and not receiving sufficient fluids from the Defendants.  Even allowing Plaintiff the inference that Stanfill's dehydration was caused by his restraint in the chair, which the Plaintiff has not and cannot prove, he still lacks sufficient evidence to prove causation.

As noted, dehydration is listed as a contributing cause of the sudden cardiac dysrhythmia that led to Stanfill's death.  Importantly, however, Dr. Sims did not testify that Stanfill would have survived had he not been dehydrated.  (Sims Dep. at 72).  In fact, Dr. Sims did not offer an opinion on the degree or seriousness of Stanfill's dehydration, nor could she say with any certainty what caused Stanfill to become dehydrated.  (Sims Dep. at 62, 71-72).  Although deliberate indifference claims do not always require expert medical testimony, the medical causation issue here "presents a technical and scientific issue that requires the specialized knowledge of an expert medical witness."  *Wingster*, 318 Fed. Appx. at 815-16 (citation omitted).  Mere temporal proximity alone between Stanfill's death and the Defendants' alleged unconstitutional

conduct is not sufficient to create a genuine issue of material fact as to the cause of
Stanfill's injuries.  *Id.*  Accordingly, the Plaintiff has failed to produce evidence that
Stanfill's injuries were caused by the Defendants' alleged deliberate indifference.
Having failed to prove a constitutional violation, the Plaintiff has not met his burden of
establishing that these Defendants are not entitled to qualified immunity.  Summary
judgment is therefore appropriate.[28]

Though the Defendants object to the Court considering the Plaintiff's claim that
Defendant Collins is liable for his delay in performing CPR or other resuscitation efforts
once Stanfill was found unresponsive, this claim fails for the same reason.  "To survive
summary judgment, a plaintiff must show that the delay attributable to the defendant's
indifference likely caused the plaintiff's injury.  An inmate who complains that delay in
medical treatment rose to a constitutional violation must place verifying medical
evidence in the record to establish the detrimental effect of delay in medical treatment to
succeed."  *McDaniels v. Lee*, 405 Fed. Appx. 456, 458-59 (11th Cir. 2010) (internal
quotations and citation omitted).  The Plaintiff has failed to show, by way of medical
evidence (or any evidence, for that matter), that Collins' alleged indifference likely
caused Stanfill's death, and summary judgment is therefore warranted.[29]

---

[28] It is well settled that the "moving party may support its motion for summary judgment with
affirmative evidence demonstrating that the non-moving party will be unable to prove its case at
trial."  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993).

[29] The Court notes that Collins' "6 minute delay" in providing medical treatment, as the Plaintiff
calls it, does not rise to the level of deliberate indifference.  As evidenced by Stanfill Video 1,
Collins enters cell J-15 at the 00:51 second mark and immediately checks for a pulse.  Though
there is no sound in the video, a nurse is summoned shortly thereafter.  Nurse Sumler enters
the cell at the 02:45 mark and, presumably, assumes medical responsibility for Stanfill.  For the
remainder of the video, Collins and another officer can be seen attempting to remove Stanfill
from the restraint chair.  Though the lack of resuscitative efforts on the video is concerning, the
Court does not attribute that delay in treatment to Collins or any other Houston County
Defendant.

Even if the Plaintiff could prove that the Defendants were deliberately indifferent to Stanfill's serious medical needs, he has failed to establish that the law applicable to the circumstances of this case was clearly established at the time of the alleged violations.  The Plaintiff has not identified a materially similar case from the United States Supreme Court, the Eleventh Circuit, or the Georgia Supreme Court, nor is this an obvious case in which the unlawfulness of the Defendants' conduct was so apparent that every objectively reasonable government official facing these circumstances would know that the official's conduct violated federal law.  *Vinyard v. Wilson*, 311 F.3d 1340, 1351-52 (11th Cir. 2002).  Accordingly, the Defendants are entitled to qualified immunity on the Plaintiff's deliberate indifference claims.

### iii.    Claims against Sheriff Talton and Major Holt

The Court now turns to the Plaintiff's claims against Sheriff Talton and Major Holt.  It is undisputed that neither Talton nor Holt had any direct contact with Stanfill during his incarceration at HCDC from June 30 until July 3.  (Doc. 127 ¶¶ 276, 288).  Instead the Plaintiff seeks to hold Talton and Holt liable for their failure to provide a written policy or training to their subordinate officers on the proper use of the restraint chair.  (Doc. 1 ¶¶ 46-47).  However, it is well established that supervisory officials cannot be held individually liable under section 1983 based on a policy or lack thereof or failure to train absent a finding that a subordinate official committed a constitutional violation.  *Howell v. City of Lithonia*, 397 Fed. Appx. 618, 621 (11th Cir. 2010); *Beshers v. Harrison*, 495 F.3d 1260, 1264 n.7 (11th Cir. 2007); *Rooney v. Watson*, 101 F.3d 1378, 1381-82 (11th Cir. 1996).  Thus, inextricably linked to the Plaintiff's claims against Talton and Holt are his claims that other Houston County Defendants violated Stanfill's

constitutional rights based on his initial and extended placement in the restraint chair. Because the Court has already found that the Defendants are entitled to summary judgment on the Plaintiff's claims against the other Houston County Defendants, the Plaintiff lacks the required underlying constitutional deprivation on which to base his claims against supervisors Talton and Holt.  Accordingly, Talton and Holt are entitled to summary judgment.

## IV. Conclusion

All parties can agree that Stanfill's death was unfortunate, and that in hindsight, perhaps more could have been done.  Hindsight, however, is not an appropriate lens through which to view the Defendants' actions.  The Plaintiff has failed to meet his burden of proving that the Defendants violated Stanfill's constitutional rights.  The Defendants are therefore entitled to qualified immunity.  Accordingly, the Plaintiff's Motion for Partial Summary Judgment is **denied**, and the Houston County Defendants' Motion for Summary Judgment is **granted**.  The Plaintiff's Motion for Sanctions is also **denied**.

**SO ORDERED,** this 29th day of March, 2012.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT